David H. Bernstein (dhbernstein@debevoise.com)*
Megan K. Bannigan (mkbannigan@debevoise.com)
Jared I. Kagan (jikagan@debevoise.com)*
Marissa Baron (mbaron@debevoise.com)*
Rachel Burns (rmburns@debevoise.com)*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
*Pro Hac Vice forthcoming

Vikas Khanna (vkhanna@sillscummis.com)
SILLS CUMMIS & GROSS P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-6993

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NOVO NORDISK INC.,<br><br>        Plaintiff,<br>   v.<br><br>ELI LILLY AND COMPANY and<br>LILLY USA, LLC,<br>        Defendants. | Civil Action No. 26-CV-09027 |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... i

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................... 4

    **I.**    **The GLP-1 Medicine Industry** ................................................... 4

    **II.**   **Novo Nordisk, Wegovy®, and Ozempic®** ................................... 5

        **A.**    **Development of Wegovy® and the STEP UP Trial** .............. 6

        **B.**    **Development of Ozempic® and the SUSTAIN FORTE Trial** ............................................................... 7

    **III.**  **Lilly's Zepbound® and Mounjaro®** ......................................... 8

        **A.**    **The Zepbound® SURMOUNT Trials** ............................. 9

        **B.**    **The Mounjaro® SURPASS Trials** .................................. 11

    **IV.**  **Lilly's False, Misleading, and Deceptive Comparative Advertising** ................................................................................ 12

        **A.**    **Lilly's Zepbound®/Wegovy® Campaign** .......................... 12

        **B.**    **Lilly's Mounjaro®/Ozempic® Campaign** ......................... 16

ARGUMENT ......................................................................................................... 17

    **I.**    **Novo Nordisk Is Likely to Succeed on the Merits of Its False Advertising and Unfair Competition Claims** ............................ 18

        **A.**    **Lilly's Advertising Is False, Misleading, and Deceptive** ........................................................................ 18

            **1.**   **Lilly's Advertising Is Literally False By Necessary Implication** ............................................ 20

            **2.**   **Lilly's Advertising Is a False Establishment Claim** ................................................................. 24

      **3.**      **Survey Evidence Confirms That Lilly's Advertising Deceives Consumers** ...............................28

  **B.**    **Lilly's Deceptive Advertising Is Material** ...........................31

  **C.**    **Lilly's Falsely Advertised Goods Travel in Interstate Commerce** ....................................................................32

  **D.**    **Lilly's Advertising Has Injured and Will Continue to Injure Novo Nordisk** ................................................33

**II.**   **Novo Nordisk Will Suffer Irreparable Harm If the Injunction Is Denied** ...................................................34

**III.**  **The Balance of Equities Tips in Favor of Novo Nordisk** ...............36

**IV.**  **Injunctive Relief Is in the Public Interest** ......................................38

**V.**   **The Court Should Require Corrective Advertising** .......................39

CONCLUSION ....................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Am. Home Prods. Corp. v. Chelsea Lab'ys, Inc.*,
   572 F. Supp. 278 (D.N.J. 1982), *aff'd*, 722 F.2d 730 (3d Cir. 1983)..................38

*CareDx, Inc. v. Natera, Inc.*,
   2019 WL 7037799 (D. Del. Dec. 20, 2019) ......................................................32

*CareDx, Inc. v. Natera, Inc.*,
   2025 WL 2480117 (3d Cir. Aug. 28, 2025) .................................................*passim*

*Castrol, Inc. v. Quaker State Corp.*,
   977 F.2d 57 (2d Cir. 1992) .......................................................24, 25, 27

*Church & Dwight Co. v. S.C. Johnson & Son, Inc.*,
   873 F. Supp. 893 (D.N.J. 1994).........................................................19

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
   843 F.3d 48 (2d Cir. 2016) ...............................................................30

*Coach, Inc. v. Fashion Paradise, LLC*,
   2012 WL 194092 (D.N.J. Jan. 20, 2012)...........................................38

*CSC Holdings, LLC v. Optimum Networks, Inc.*,
   731 F. Supp. 2d 400 (D.N.J. 2010)....................................................18

*Energy Four, Inc. v. Dornier Med. Sys., Inc.*,
   765 F. Supp. 724 (N.D. Ga. 1991).....................................................40

*GlaxoSmithKline LLC v. Boehringer Ingelheim Pharms., Inc.*,
   484 F. Supp. 3d 207 (E.D. Pa. 2020)............................................38, 39

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
   774 F.3d 192 (3d Cir. 2014) .................................................*passim*

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
   700 F. App'x 251 (4th Cir. 2017).....................................................40

*Hayward Indus., Inc. v. Saltwater Pool Supplies*,
   2021 WL 1940711 (D.N.J. May 14, 2021).......................................33

i

*IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*,
    2009 WL 5205968 (D.N.J. Dec. 28, 2009)............................................................31

*Kalmbach Feeds, Inc. v. Purina Animal Nutrition, LLC*,
    2025 WL 3153412 (S.D. Ohio Nov. 12, 2025) .............................................39, 40

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) ..............................................................................36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)............................................................................................33

*Merck Eprova AG v. Gnosis S.p.A.*,
    760 F.3d 247 (2d Cir. 2014) ........................................................................32, 33

*MGMT Residential, LLC v. Reeves*,
    2023 WL 2471263 (E.D. Pa. Mar. 10, 2023) ...............................................34, 38

*Newborn Bros. Co. v. Albion Eng'g Co.*,
    481 F. Supp. 3d 312 (D.N.J. 2020)..................................................28, 31, 33, 38

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
    Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002) ......................................................................*passim*

*Novo Nordisk A/S v. Liferxmd*,
    2026 WL 222214 (D.N.J. Jan. 28, 2026)....................................................18, 34

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
    920 F.2d 187 (3d Cir. 1990) ..............................................................................36

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
    292 F. Supp. 2d 594 (D.N.J. 2003)..............................................................19, 35

*Smart Vent, Inc. v. Crawl Space Door Sys. Inc.*,
    2017 WL 4948063 (D.N.J. Nov. 1, 2017) .........................................................37

*Telebrands Corp. v. Ragner Tech. Corp.*,
    2019 WL 1468156 (D.N.J. Apr. 3, 2019)..........................................................32

*Therabody, Inc. v. Dialectic Distribution LLC*,
    2024 WL 3355308 (D.N.J. July 10, 2024) ........................................................18

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*,
  898 F.2d 914 (3d Cir. 1990) ..............................................................................31

*Warner-Lambert Co. v. Breathasure, Inc.*,
  204 F.3d 87 (3d Cir. 2000) ................................................................................18

**Statutes**

15 U.S.C. § 1116(a) ...............................................................................................34

Novo Nordisk Inc. ("Novo Nordisk") respectfully submits this memorandum of law in support of its motion to preliminarily enjoin Eli Lilly & Co. and Lilly USA, LLC (together, "Lilly") from disseminating false and misleading direct-to-consumer advertisements for its GLP-1 weight-loss and type 2 diabetes medicines.

## PRELIMINARY STATEMENT

Lilly is deceiving millions of Americans about GLP-1 medicines with two nationwide advertising campaigns. The first claims that Lilly's weight-loss medicine Zepbound® produces significantly more weight loss than Novo Nordisk's Wegovy®. The second claims that Lilly's type 2 diabetes medicine, Mounjaro®, reduces A1c (a key measure of blood sugar control) significantly more than Novo Nordisk's Ozempic®. Lilly tells consumers these comparisons are "just the facts." They are not.

Both campaigns rest on the same deceptive foundation: Lilly knowingly uses outdated clinical trials to tout dramatically superior efficacy even though those trials did not include the highest and most effective doses of Novo Nordisk's medicines, which became available after those trials were conducted.

First, Lilly relies on a two-year old clinical trial known as SURMOUNT-5, which compared Zepbound® 10mg and 15 mg against Wegovy® 1.7 mg and 2.4 mg. Based on this trial, Lilly advertises that Zepbound® helps patients lose on average 50 pounds (20.2% weight loss) whereas Wegovy® helps patients lose on

1

average only about 33 pounds (13.7% weight loss). But, in March 2026, the FDA approved a new and more effective dose of Wegovy®, 7.2 mg, which demonstrated an average weight loss of approximately 47 pounds (18.8% weight loss). Lilly's advertising campaign touting far superior efficacy based on an outdated clinical trial is deceptive in light of the availability of this far more effective dose of Wegovy®.

Lilly pursues the same misleading advertising tactic for its diabetes medicine, Mounjaro®. The advertising relies on a five-year-old clinical trial known as SURPASS-2 that compared the highest dose of Mounjaro® (15 mg) to the 1 mg dose of Ozempic® (at the time, the highest approved dose of Ozempic®). That trial showed that Mounjaro® helps reduce A1c by 2.3% whereas Ozempic® reduces A1c by only 1.9%. That trial is also outdated; more than four years ago, the FDA approved the 2 mg dose of Ozempic®, which was shown to provide greater A1c reduction than the 1 mg dose. Despite the availability of this updated data, in 2026, Lilly launched a new ad campaign that cites to the outdated, inaccurate data of this 2021 trial as if it were still relevant today.

Although Lilly knows these facts, it actively conceals them with disclosures so limited and inadequate that they do nothing to correct the misimpression the advertising communicates. Lilly deceptively advertises stale, outdated comparisons as though they reflect the current efficacy of the available treatments and claims dramatic superiority that does not exist. Indeed, rather than correct its advertising

2

after Novo Nordisk complained, Lilly doubled down: in June 2026 — just weeks before this filing — it expanded the Zepbound® campaign to sponsored advertisements on TikTok and Facebook, which characterized SURMOUNT-5 as a "head-to-head" comparison and declared that these are "just the facts."

Lilly's advertisements are literally false, which means that deception is presumed. But Novo Nordisk went beyond the presumption; it also submits consumer survey evidence that confirms that consumers are deceived. More than 30% of consumers exposed to the Zepbound® ad took away the false message that Zepbound® produces significantly more weight loss than Wegovy®, and more than 30% of consumers exposed to the Mounjaro® ad took away the false message that Mounjaro® was compared to the most effective dose of Ozempic®. Both figures far exceed the threshold that courts in this Circuit have found demonstrate deception.

The harm to Novo Nordisk is obvious and irreparable. Since late April 2026, the Zepbound® ad has received approximately 700 million impressions, and Lilly continues to expand its campaign. In this fiercely competitive space, comparative efficacy is central to patients' discussions with their healthcare professionals and resulting prescribing decisions. Every day Lilly's campaigns run, they divert patients to Zepbound® and Mounjaro®, entrench false impressions of Wegovy®'s and Ozempic®'s inferiority, and erode goodwill Novo Nordisk has spent decades building. Money damages cannot undo that harm.

The narrow preliminary injunction Novo Nordisk seeks would not stop Lilly from selling or advertising Zepbound® or Mounjaro®. Lilly runs many other commercials for these products that make no comparative claims, and those commercials would be unaffected. Novo Nordisk seeks only to prevent Lilly from continuing to mislead consumers with deceptive, outdated comparisons. Novo Nordisk tried to resolve this dispute without Court intervention — it sent Lilly a detailed cease-and-desist letter in April 2026 and, after filing this lawsuit, again demanded that Lilly pull the false ads. Declaration of David Bernstein ("Bernstein Decl.") Ex. 1. Lilly refused, calling its advertising "truthful" and "transparent," rejecting Novo Nordisk's demands in their entirety, and making clear it has no intention of modifying the challenged campaigns. *Id.* Ex. 2. Lilly has left Novo Nordisk no choice but to seek judicial relief. The public interest, the equities, and the law all point the same way. Novo Nordisk respectfully requests that the Court enjoin Lilly's false advertising.

## FACTUAL BACKGROUND

### I.    The GLP-1 Medicine Industry

Glucagon-like peptide-1 receptor agonists ("GLP-1s") are prescription medicines used to treat serious chronic conditions like obesity and type 2 diabetes. They work by mimicking a naturally occurring hormone that slows gastric emptying and promotes a feeling of fullness — reducing appetite and food intake and, for

patients with diabetes, stimulates the release of insulin helping to regulate blood sugar levels. Declaration of Andrea Traina ("Traina Decl.") ¶ 8; Declaration of Michael Radin ("Radin Decl.") ¶ 9. Approximately 100 million Americans meet the clinical criteria for obesity, a chronic disease associated with cardiovascular disease, type 2 diabetes, and other serious health risks. Traina Decl. ¶ 9. Approximately 40 million Americans live with type 2 diabetes, which can cause serious complications like nerve, organ, and blood vessel damage. Radin Decl. ¶ 10.

For many of these patients, GLP-1 medicines have been revolutionary, and demand for GLP-1 treatment has grown rapidly, with industry projections estimating that more than 30 million Americans may be using a GLP-1 treatment by 2030. The global demand for GLP-1s could reach $190 billion by 2035. Many consumers who see direct-to-consumer advertising about these medicines specifically ask their healthcare professionals about them, and to prescribe them. Declaration of Derrick Gastineau ("Gastineau Decl.") ¶¶ 29, 25.

## II.    Novo Nordisk, Wegovy®, and Ozempic®

Novo Nordisk has been a leader in the GLP-1 space since 2010. Its medicine liraglutide (sold under the brand name Victoza®) became the first FDA-approved GLP-1 to treat type-2 diabetes. In 2014, liraglutide (sold by Novo Nordisk under the brand name Saxenda®) was the first FDA-approved GLP-1 to treat weight reduction and management in adults. Later, Novo Nordisk developed semaglutide-based

medications, including Wegovy®, for the treatment of obesity (in both injectable and oral tablet form), and Ozempic® (in both injectable and oral tablet form) for the treatment of type 2 diabetes. Novo Nordisk is the only pharmaceutical company with FDA-approved medicines containing semaglutide. Gastineau Decl. ¶¶ 8–9.

### A. Development of Wegovy® and the STEP UP Trial

Wegovy® is a semaglutide GLP-1 injectable medicine indicated for weight reduction and management in patients aged 12 and older with obesity, and in adults with overweight and with at least one weight-related comorbid condition. Wegovy® is also indicated to reduce the risk of major adverse cardiovascular events in adults with established cardiovascular disease and either obesity or overweight, among other conditions. Traina Decl. ¶¶ 11–13.

The FDA approved Wegovy® in 2021 as a once-weekly injection in doses of 0.25 mg, 0.5 mg, 1 mg, 1.7 mg, and 2.4 mg. Patients initiate treatment at the lowest dose and increase over time under the direction of their healthcare professional. Once a patient reaches the maximum tolerated dose, the patient continues that "maintenance dose" for ongoing treatment. Until March 2026, 2.4 mg was the highest and most effective FDA-approved maintenance dose of injectable Wegovy®. *Id.* at ¶¶ 11, 14–15.

One of Novo Nordisk's latest innovations in the Wegovy® family is the development of a higher, more effective injectable dose for weight loss. In March

6

2026, the FDA approved Wegovy® 7.2 mg, a once-weekly injection that is now the highest and most effective maintenance dose of Wegovy®. The FDA's approval of Wegovy® 7.2 mg was based on Novo Nordisk's STEP UP clinical trial, a double-blind, randomized, placebo-controlled trial that demonstrated that Wegovy® 7.2 mg provides significantly greater average weight loss than Wegovy® 2.4 mg. In the STEP UP trial, participants with obesity receiving Wegovy® 7.2 mg experienced average weight loss of 18.8%, or approximately 47 pounds; approximately one in three participants achieved a 25% average weight loss or greater. By comparison, patients treated with Wegovy® 2.4 mg achieved average weight loss of 15.5%, or approximately 38 pounds. *Id.* at ¶¶ 16–18, 20.

**B.    Development of Ozempic® and the SUSTAIN FORTE Trial**

Patients with type 2 diabetes are unable to properly regulate their blood sugar (also known as blood glucose) because their bodies have insulin resistance, requiring a higher amount of insulin to regulate their blood sugar. As glucose builds up in the blood (the three-month average of which is assessed by a measurement commonly referred to as A1c), it can damage blood vessels, nerves and organs, and, eventually, can be fatal. It is thus critical that patients with type 2 diabetes reduce their A1c, preferably to 7% or less (an A1c of 5.7% is normal for patients without diabetes; anything above 10% is considered dangerous). Radin Decl. ¶ 10.

Novo Nordisk developed a semaglutide-based GLP-1 medicine for treatment

of type 2 diabetes, sold under the Ozempic® brand. Ozempic®, approved by the FDA in 2017, is a once-weekly injectable medicine indicated to improve glycemic control (*i.e.*, reduce A1c levels) in adults with type 2 diabetes. Like Wegovy®, patients treated with Ozempic® start treatment at the lowest dose (.25 mg) and then increase the dose over time under medical supervision, based on the approved dosing schedule, the patient's treatment needs, and the patient's ability to tolerate the medicine without undue side effects (such as gastric discomfort). *Id.* at ¶¶ 12, 15.

When Ozempic® was first approved, the available doses were .25 mg, .5 mg and 1 mg. In March 2022, the FDA approved Ozempic® 2 mg for adults with type 2 diabetes who need additional glycemic control beyond that provided by Ozempic® 1 mg. That approval was based on Novo Nordisk's SUSTAIN FORTE clinical trial, a double-blind, randomized, active-controlled trial comparing the safety and efficacy of Ozempic® 2 mg to Ozempic® 1 mg. Participants receiving Ozempic® 2 mg achieved an average A1c reduction of 2.1% over 40 weeks compared to an average 1.9% A1c reduction with Ozempic® 1 mg. Ozempic® 2 mg is now the highest and most effective dose of injectable Ozempic® for patients with type 2 diabetes. *Id.* at ¶¶ 15, 17, 19–20, 22.

## III.   Lilly's Zepbound® and Mounjaro®

Lilly is Novo Nordisk's principal competitor for FDA-approved GLP-1 prescriptions used to treat obesity and type 2 diabetes, and both companies together

sell over 99% of the FDA-approved GLP-1 medicines in the United States. Gastineau Decl. ¶ 24.  Lilly's medicines contain tirzepatide, a different product that helps improve blood sugar control, reduce appetite, and support weight reduction and management. Lilly markets Zepbound® for obesity and sleep apnea; it markets Mounjaro® for type 2 diabetes. Traina Decl. ¶ 22; Radin Decl. ¶ 24.

Zepbound® was approved by the FDA in 2022 as a once-weekly injection indicated for weight reduction and management in adults with obesity or with overweight and at least one weight-related comorbid condition. The recommended maintenance doses for weight reduction are 5 mg, 10 mg, and 15 mg. Wegovy® and Zepbound® compete directly for sales of GLP-1 medicines for chronic weight management. Traina Decl. ¶ 22, Ex. 4.

The FDA approved Mounjaro® in 2022 as a once-weekly injection. Mounjaro® is indicated, as an adjunct to diet and exercise, to improve glycemic control in adults with type 2 diabetes. It comes in doses ranging from 2.5 mg to 15 mg, and patients on Mounjaro® typically increase their dosage over time, with a maximum dose of 15 mg once weekly. Ozempic® and Mounjaro® compete directly for FDA-approved GLP-1 prescriptions for type 2 diabetes. Radin Decl. ¶ 24, Ex. 4.

### A.    The Zepbound® SURMOUNT Trials

Lilly conducted a clinical trial called SURMOUNT-1 in 2022 to evaluate the effectiveness of the three maintenance doses of Zepbound® (5 mg, 10 mg, and 15

9

mg). Like Novo Nordisk's STEP UP trial, SURMOUNT-1 was a double-blind, randomized, placebo-controlled clinical trial. SURMOUNT-1 reported average weight loss of 15.0% for participants on the 5 mg dose of Zepbound®, 19.5% for participants on the 10 mg dose, and 20.9% for participants on the highest-approved maintenance dose of Zepbound® (15 mg).[1] Traina Decl. ¶¶ 23–24.

Lilly also sponsored SURMOUNT-5, a clinical trial conducted from 2023 to 2024, to compare the safety and efficacy of Zepbound® against Wegovy® in adults with obesity or with overweight and at least one weight-related complication but without diabetes. Unlike SURMOUNT-1 and Novo Nordisk's STEP UP and SUSTAIN FORTE trials, SURMOUNT-5 was an open-label trial, meaning both participants and investigators knew which medicine each participant received, creating a risk that expectations can influence behavior and reporting, which makes the results less reliable than those from a double-blind trial. *Id.* at ¶¶ 26, 28, 42.

SURMOUNT-5 tested Zepbound® 10 mg and 15 mg against Wegovy® 1.7 mg and 2.4 mg. At the time the trial was conducted, those were the highest and most effective FDA-approved maintenance doses of each product. The trial reported average weight loss of 20.2%, or 50.3 pounds, for Zepbound® participants and

---

[1] Although SURMOUNT-1 does not report weight loss in pounds, Lilly advertises on its website that in the treatment regimen population, the average weight loss was approximately 34 pounds, 44 pounds, and 48 pounds. WHAT IS ZEPBOUND, https://zepbound.lilly.com/weight/what-is-zepbound (last visited July 23, 2026).

13.7%, or 33.1 pounds, for Wegovy® participants. Because Wegovy® 7.2 mg had not yet been approved at that time, it was not included in the trial. *Id.* at ¶¶ 27, 33.

When the FDA approved Wegovy® 7.2 mg in March 2026, SURMOUNT-5 became outdated. It no longer reflects a comparison of the highest and most effective doses available in the market. Although there is no clinical trial that directly compares the highest approved doses of Zepbound® and Wegovy®, the best available data shows that Wegovy® 7.2 mg is significantly more effective than the doses of Wegovy® tested in SURMOUNT-5: Novo Nordisk's STEP UP trial demonstrated that Wegovy® 7.2 mg produces an average weight loss of approximately 47 pounds (18.8% of body weight). *Id.* at ¶¶ 20, 32, 36.

### B. The Mounjaro® SURPASS Trials

Lilly sponsored a clinical trial known as SURPASS-2 to evaluate the safety and efficacy of tirzepatide, the active ingredient in Mounjaro®, against injectable semaglutide, the active ingredient in Ozempic®, in adults with type 2 diabetes whose blood sugar was inadequately controlled with metformin alone (another medication indicated for the treatment of type 2 diabetes). Radin Decl. ¶ 25.

Like SURMOUNT-5, SURPASS-2 was an open-label trial, meaning that participants and investigators knew whether participants were receiving Mounjaro® (tirzepatide) or Ozempic® (semaglutide). SURPASS-2 compared three doses of Mounjaro®, 5 mg, 10 mg, and 15 mg, against one doze of Ozempic®: 1 mg. The

11

trial reported average A1c reductions of 2.0%, 2.2%, and 2.3% for the three doses of Mounjaro®, and 1.9% for Ozempic® 1 mg. The trial did not include Ozempic® 2 mg, which had not yet received FDA approval. *Id.* at ¶¶ 26–28.

When the FDA approved Ozempic® 2 mg in March 2022, SURPASS-2 became outdated. It no longer reflects a comparison of the highest and most effective doses available in the market. There is no clinical trial that directly compares the highest approved doses of Mounjaro® and Ozempic®. *Id.* at ¶¶ 28, 30.

## IV.    Lilly's False, Misleading, and Deceptive Comparative Advertising

Lilly is running two direct-to-consumer advertising campaigns that make false and misleading comparative efficacy claims; one for Zepbound® against Wegovy®, and one for Mounjaro® against Ozempic®. Across both, Lilly uses the same playbook: bold side-by-side comparisons citing outdated clinical trials that did not test the highest and most effective approved doses of Novo Nordisk's medicines, with disclosures so limited and hidden that they do nothing to correct the false impression. The advertising is distributed nationally on television, consumer-facing websites, and social media platforms. Traina Decl. ¶¶ 31–38; Radin Decl. ¶¶ 29–34.

### A.    Lilly's Zepbound®/Wegovy® Campaign

Lilly has been running a television advertisement comparing Zepbound® to Wegovy® based on SURMOUNT-5. In the commercial, Lilly presented a bold side-by-side comparison of the two products, prominently stating that patients taking

12

Zepbound® lost an average of 50 pounds (20.2% of their body weight), compared to 33 pounds (13.7% of their body weight) for patients taking Wegovy®. The initial advertisement identified the products as Zepbound® "MTD" and Wegovy® "MTD," meaning maximum tolerated dose, and included small-print disclosure language stating that the data was collected in a "less-rigorous study" with "findings less certain." Traina Decl. ¶¶ 29–31, Exs. 7–8.



After the FDA approved Wegovy® 7.2 mg in March 2026, Lilly continued to run the original commercial even though SURMOUNT-5 no longer presented an up-to-date comparison to the maximum tolerated dose for Wegovy®. On April 22, 2026, Novo Nordisk sent Lilly a letter objecting to continued use of the ad given the FDA's approval of Wegovy® 7.2 mg and that the STEP UP trial established that Wegovy® 7.2 mg produces greater weight loss than the lower Wegovy® doses tested in SURMOUNT-5. Novo Nordisk noted that Lilly's continued reliance on

13

SURMOUNT-5 misleads consumers about the comparative efficacy of Wegovy® and Zepbound®, and demanded that Lilly suspend the challenged advertising and refrain from future consumer-directed comparative claims based on SURMOUNT-5. Gastineau Decl. ¶¶ 19–22; Traina Decl. ¶ 34.

Lilly did not respond to Novo Nordisk's letter. Instead, Lilly made limited, woefully inadequate revisions to the commercial. The revised commercial continued to feature the same central comparison — 50 pounds for Zepbound® versus 33 pounds for Wegovy® — but modified the voiceover and on-screen text to state that the study compared Zepbound® 10 mg and 15 mg against Wegovy® injection 1.7 mg and 2.4 mg. Lilly also added small-print disclosure language stating that "Wegovy® 7.2 mg was not evaluated in this study" and "has since been approved." Even though Wegovy® 7.2 mg was shown in another trial to provide significantly greater weight loss than Wegovy® 2.4 mg (47 pounds), the revised commercial continued to prominently present the 33-pound weight-loss results for Wegovy® 2.4 mg. Gastineau Decl. ¶¶ 19–22; Traina Decl. ¶ 34, Exs. 10–11.



14

Lilly also makes the same comparison on its consumer-facing Zepbound® website, with the same small-print disclosures stating that Wegovy® 7.2 mg was not evaluated in the study and has since been approved, and that the data were collected in a less rigorous study with less certain findings. The website, like the commercial, prominently presents the weight-loss figures as a direct brand comparison between Zepbound® and Wegovy®. Traina Decl. ¶ 33, Ex. 9.

Rather than withdraw the challenged comparison in response to Novo Nordisk's letter, Lilly expanded its advertising campaign to social media. In June 2026, Lilly began disseminating sponsored advertisements on TikTok and Facebook, which repeat the same outdated 50-pound-to-33-pound comparison, describes the comparison as a "head-to-head study," and states: "Those are just the facts." Although the social media advertisements include a small-print disclosure stating that Wegovy® 7.2 mg was not evaluated in the study and has since been approved, that disclosure does not cure the misleading net impression. To the contrary, the phrase "those are just the facts" signals to consumers that Lilly's comparison is complete, objective, and not subject to meaningful qualification, when, in reality, it omits the highly material fact that the highest and most effective dose of Wegovy® has been shown to lead to an average of 47 pounds of weight loss. Traina Decl. ¶ 35, Exs. 12–15.

15

**B.    Lilly's Mounjaro®/Ozempic® Campaign**

Lilly is simultaneously running a campaign for Mounjaro® that makes false and misleading comparative claims against Novo Nordisk's Ozempic®. In Lilly's nationally distributed Mounjaro® television commercial, which began airing in May 2026 (more than four years after Ozempic® 2 mg was approved), Lilly presents a bold side-by-side comparison prominently stating that Mounjaro® 15 mg reduced A1c by 2.3%, compared to a 1.9% A1c reduction for Ozempic® 1 mg. The advertisement includes a small-print disclosure stating: "Ozempic® 2 mg not available at time of study." Radin Decl. ¶¶ 29, 32, Exs. 6–7.



Lilly makes the same comparison on its consumer-facing Mounjaro® website, which invites consumers to "[s]ee how Mounjaro® compares against competitors like Ozempic®," and then prominently states "Mounjaro® lowered A1c more than Ozempic® 1 mg" with a bar graph showing average A1c reductions of 2.0% for

Mounjaro® 5 mg, 2.2% for Mounjaro® 10 mg, and 2.3% for Mounjaro® 15 mg, compared to 1.9% for Ozempic® 1 mg. The website states that "Ozempic® 2 mg was not available at the time of the study," but says nothing about whether Ozempic® 2 mg is now available, what the clinical data on Ozempic® 2 mg shows, and that Ozempic® 2 mg is the highest and most effective dose available. Radin Decl. ¶ 33, Ex. 8. Lilly has also promoted this comparison through sponsored social media advertising. A paid Facebook advertisement, which started running in July 2026, invites consumers to "take a closer look" and to "see how Mounjaro® compares to some other type 2 diabetes medicines including Ozempic® (semaglutide) injection." It prompts them to "[s]ee the results," linking directly to Lilly's consumer-facing Mounjaro® website displaying the bar graph comparing Mounjaro® to Ozempic® 1 mg described above. Radin Decl. ¶ 34, Exs. 9–10. Lilly follows the same playbook here too: as with Lilly's Zepbound® ads, these ads deceptively report the results of an outdated trial comparing the highest and most effective dose of Mounjaro® to a lower and less effective dose of Ozempic®.

## ARGUMENT

A plaintiff is entitled to a preliminary injunction upon establishing (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tip in its favor; and (4) the public interest favors relief. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014).

**I.      Novo Nordisk Is Likely to Succeed on the Merits of Its False Advertising and Unfair Competition Claims**

To prevail on a false advertising claim under the Lanham Act, a plaintiff must prove that (1) the defendant made false or misleading statements about its own or another's product; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in the form of declining sales, loss of good will, etc. *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000); *Groupe SEB*, 774 F.3d at 198; *CareDx, Inc. v. Natera, Inc.*, 2025 WL 2480117, at *4 (3d Cir. Aug. 28, 2025). Novo Nordisk prevails on every element of its Lanham Act false advertising claim.[2]

**A.      Lilly's Advertising Is False, Misleading, and Deceptive**

An advertisement violates the Lanham Act if it is literally false or if, though literally true in isolation, it is misleading in context. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586–87 (3d

---

[2]  Lilly's false, misleading, and deceptive advertising also violates New Jersey's statutory unfair competition law and common law, both of which are analyzed under standards identical to the Lanham Act claim and are therefore established for the same reasons. *See Therabody, Inc. v. Dialectic Distribution LLC*, 2024 WL 3355308, at *8 (D.N.J. July 10, 2024); *Novo Nordisk A/S v. Liferxmd*, 2026 WL 222214, at *6 (D.N.J. Jan. 28, 2026); *CSC Holdings, LLC v. Optimum Networks, Inc.*, 731 F. Supp. 2d 400, 411 (D.N.J. 2010).

Cir. 2002). Literal falsity includes claims that are false by necessary implication, where the advertisement, viewed as a whole, communicates a false message "as readily as if it had been explicitly stated." *Id.* Literal falsity also includes false establishment claims, where an advertiser invokes studies as proving a proposition the studies do not actually establish. *CareDx, Inc.*, 2025 WL 2480117, at *5. If an advertisement is literally false, deception is presumed. *Groupe SEB*, 774 F.3d at 198.

If an ad is not literally false but survey evidence shows it nevertheless communicates a false message, that also constitutes false advertising. *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 599 (D.N.J. 2003) ("Where the plaintiff is unable to demonstrate that the complained-of statement is literally false, a Lanham Act violation may still be established by proving that the commercial makes a false or misleading claim *and* that a substantial portion of consumers actually understand the ad to be making that claim.… '[T]he success of [the plaintiff's] claim usually turns on the persuasiveness of a consumer survey.'"); *Church & Dwight Co. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 906 (D.N.J. 1994) (ad can be found deceptive or misleading based on the message conveyed to consumers as reflected in a consumer survey).

All three theories apply here. The ads are literally false by necessary implication because the only reasonable interpretation of these ads is that they represent a fair comparison: that the highest and most effective doses of Zepbound®

19

and Mounjaro® were, respectively compared to the highest and most effective doses of Wegovy® and Ozempic® and were shown to be dramatically superior. That is just not true. As a result, the advertisements necessarily convey deceptive comparisons and false superiority messages about the products presently available to consumers.

The ads are also literally false establishment claims. The ads cite studies that allegedly show that Zepbound® and Mounjaro® are dramatically better than Wegovy® and Ozempic®.  They also cite studies that allegedly show that Wegovy® only leads to average weight loss of 33 pounds and that Ozempic® only leads to A1c reduction of 1.9%. The studies do not establish those propositions because they never tested the highest and most effective doses of Wegovy® and Ozempic®.

Even if the ads were not literally false, survey evidence establishes that they are communicating false messages. Specifically, consumers exposed to Lilly's advertisements take away the misleading messages that the trials cited in Lilly's ads compared the most effective doses of the parties' products and that Lilly's products are dramatically superior to Novo Nordisk's products.

### 1.  Lilly's Advertising Is Literally False By Necessary Implication

Lilly's side-by-side advertising is false by necessary implication because it presents its products and Novo Nordisk's products as if they were compared on equal footing, while hiding the most important fact: the underlying clinical trials did not

test the highest and most effective doses of Novo Nordisk's competing products that are now FDA approved and available. The unavoidable and false takeaway is that Zepbound® is far superior to Wegovy® for weight loss and that Mounjaro® is far superior to Ozempic® for A1c reduction. In addition, the ads promote the false message that patients on Wegovy® only lose, on average, 33 pounds, and patients on Ozempic® only reduce their A1c by 1.9%. Those messages are false.

**a.      Zepbound®/Wegovy®**

As explained above, Lilly's Zepbound® advertising fails to clearly disclose that the reported trial did not compare Zepbound® to the most effective dose of Wegovy® (7.2 mg), which provides much greater weight loss than just an average of 33 pounds. In fact, the STEP UP trial submitted to the FDA in connection with the approval of Wegovy® 7.2 mg demonstrated that Wegovy® 7.2 mg produces an average weight loss of approximately 47 pounds (18.8% of body weight)—far more than the 33 pounds Lilly's advertising attributes to Wegovy®. But that is not what the ad says. Instead, consumers see a brand-versus-brand, pound-versus-pound display that can only be understood to mean that the products were tested at their most effective levels, and one is dramatically better.

- The voiceover states that people lost "50 pounds compared to an average of 33 pounds with up to a 2.4 mg dose of the Wegovy® injection." The phrase "up to a 2.4 mg dose" communicates that 2.4 mg is the highest available dose of

21

Wegovy® because a reasonable consumer has no reason to know that a higher and more effective dose now exists and was simply left out of the comparison.

- The on-screen writing places the two brands side by side — "ZEPBOUND® ... 50 LBS / 20.2% WEIGHT LOSS" against "WEGOVY® ... 33 LBS / 13.7% WEIGHT LOSS" — in a format that can only be read one way: here are two products in a direct comparison, and one is dramatically better.

- The TikTok and Facebook advertisements make the point explicit. They describe SURMOUNT-5 as a "head-to-head study" and, immediately after presenting the 50-versus-33-pound comparison, tells consumers: "Those are just the facts." The phrase "head-to-head" tells consumers that both products were tested at their best. The phrase "just the facts" tells consumers the comparison is objective and complete, and that nothing material has been left out. The necessary implication is that the comparison is the full picture even though it is not.

The disclaimer that the study did not test Wegovy® 7.2 mg is completely ineffective. Not only is it unlikely to be read, but it also fails to explain that Wegovy® 7.2 mg has been shown to be the most effective dose of Wegovy® and, per the STEP UP trial, produces average weight loss of approximately 47 pounds (18.8% of body weight)—not the 33 pounds Lilly advertises. The Third Circuit's decision in *Groupe SEB* is directly on point. There, Shark marketed its steam iron with two claims appearing on the front of its packaging: a claim on the bottom right

22

expressly comparing Shark's steam irons to Rowenta, and a claim directly above it on the top right asserting "#1 MOST POWERFUL STEAM" with fine print qualifying that the #1 ranking applied only to irons in the same price range. 774 F.3d at 195. However, Rowenta was in a different, higher price range and was therefore not covered by the #1 claim. The Third Circuit held that a reasonable consumer would read both claims together and would "necessarily and unavoidably" understand the ad to mean that Shark outperformed Rowenta because the fine-print qualification was insufficient to overcome the net impression created by the prominent side-by-side comparison. *Id.* at 202. The same principle applies here: Lilly places Zepbound® and Wegovy® side by side, displays "50 LBS" and "33 LBS" in large type, reinforces the comparison through voiceover, and, in social media, calls it a "head-to-head study" and "just the facts." And, as in *Groupe SEB*, Lilly's disclaimer does not cure that false message because it is too small, too fleeting, and too incomplete to overcome the dramatic comparison that dominates the advertising. Because the advertising is literally false by necessary implication, deception is presumed. *See id.* at 198; *Novartis*, 290 F.3d at 586.

### b.    **Mounjaro®/Ozempic®**

The same analysis applies to Lilly's Mounjaro® advertising. SURPASS-2 compared Mounjaro® 5 mg, 10 mg, and 15 mg against Ozempic® 1 mg, but did not include Ozempic® 2 mg, which FDA approved more than four years ago, and which

long has been the highest and most effective approved Ozempic® dose. Lilly nevertheless is running new ads that present SURPASS-2 as a current brand-to-brand comparison: its television commercial displays Mounjaro® 15 mg reducing A1c by 2.3%, compared to 1.9% for Ozempic® 1 mg, and Lilly's website states that "Mounjaro® lowered A1C more than Ozempic® 1 mg," with a bar graph showing all three Mounjaro® doses outperforming Ozempic® 1 mg. The unmistakable and inaccurate takeaway is that a comparison to Ozempic® 1 mg is the relevant comparison and that Mounjaro® is materially superior to Ozempic®. That is also false by necessary implication, and Lilly's disclaimer fails to cure the problem both because it is unlikely to be seen and, in any event, does not effectively disclose that Ozempic® 2 mg provides dramatically greater A1c reduction than Ozempic® 1 mg.

**2.     Lilly's Advertising Is a False Establishment Claim**

Lilly's advertising is also false because it makes false "establishment claims" that the cited clinical trials do not support. A false establishment claim arises when an advertiser expressly or impliedly represents that tests or studies prove a proposition the studies do not actually establish. *CareDx, Inc.*, 2025 WL 2480117, at \*5; *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992). To prove a false establishment claim, Novo Nordisk need only show that the trials Lilly invokes do not "establish" the proposition for which Lilly cites them — either because they are not sufficiently reliable to support that proposition, or because, even

24

if reliable, they do not prove the advertised claim. *Castrol*, 977 F.2d at 63; *CareDx*, 2025 WL 2480117, at *5.

*Castrol* illustrates the point. There, Quaker State advertised that "tests prove" its motor oil provided better protection against engine wear at start-up. 977 F.2d at 59. But the cited tests showed only faster oil flow, not better protection. *Id.* at 59–60. The Second Circuit affirmed the injunction because the tests did not establish the proposition for which they were cited (*i.e.*, better protection). *Id.* at 63–64. The same principle applies here. SURMOUNT-5 and SURPASS-2 do not establish the broader propositions Lilly communicates to consumers.

*CareDx* confirms that Lilly cannot avoid liability simply by pointing out that the test results in the ads are drawn from real studies and the numerical results are accurately reported. In *CareDx*, Natera placed results from separate clinical studies side by side to claim that its kidney transplant test, Prospera, outperformed the competitor, AlloSure. 2025 WL 2480117, at *1–2, *5–6. But the Third Circuit affirmed a jury verdict that this side-by-side presentation was literally false—even though Natera accurately reported the numerical results from the studies—because it necessarily implied to consumers that the studies were comparable and established Prospera's superiority, when in fact the studies differed in design, methodology, and patient populations and did not support that conclusion. *Id.* at *5–6. The same principles apply here: Lilly relies on the results of SURMOUNT-5 and SURPASS-

25

2, but the clinical trials did not include the highest and most effective approved doses of Novo Nordisk's products. They therefore establish neither the sweeping superiority Lilly claims, nor that Wegovy® will only help patients lose an average of 33 pounds, nor that Ozempic® will only help patients reduce A1c by 1.9%.

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.* and *McNeil-PPC, Inc. v. Pfizer Inc.* reinforce the same principle. In *Bracco*, the advertiser promoted its radiology contrast agent, Visipaque, by citing a study that compared it to only one competing product, Omnipaque, but implied superiority over the entire class of competing contrast agents. The court held this was a false establishment claim because a study testing only one comparator cannot establish superiority over products it never tested. 627 F. Supp. 2d 384, 469 (D.N.J. 2009).

Similarly, in *McNeil*, Pfizer advertised that "clinical studies prove" Listerine was as effective as dental floss, but the studies showed only efficacy in a narrow population (patients with mild to moderate gingivitis who did not floss properly), and did not support the sweeping consumer-facing claim the advertiser made. 351 F. Supp. 2d 226, 251–56 (S.D.N.Y. 2005) (enjoining ads). Lilly makes the same fundamental error: it cites outdated clinical trials that tested only lower doses of Novo Nordisk's medicine for broad, unqualified claims of superiority against Novo Nordisk's current products.

In addition, Lilly cannot defend its advertising by claiming (as it has done in

26

the press in response to this lawsuit) that SURMOUNT-5 is a "gold standard" head-to-head trial and that Lilly is merely "communicating the results" of that trial. That is precisely the defense that fails under the false establishment claim doctrine. An advertiser may accurately report numbers from a study and still violate the Lanham Act if the study does not establish the proposition the advertising communicates. *See Castrol*, 977 F.2d at 63; *CareDx*, 2025 WL 2480117, at \*5–6. The absurdity of Lilly's position is apparent when taken to its logical conclusion. If citing outdated trial results with a fine-print disclaimer were sufficient, Lilly could continue running the same advertisement for the next decade, even if the FDA were to approve Wegovy® 15 mg tomorrow and clinical data showed it produces 100 pounds of average weight loss. Under Lilly's theory, it could still tell consumers that Zepbound® is dramatically superior based on an outdated comparison.

There is another problem with the trials on which Lilly relies: both SURMOUNT-5 and SURPASS-2 were open-label trials, which differ from the gold standard double-blind trials, and whose results must be viewed with caution. *See* Traina Decl. ¶¶ 28, 42; Radin Decl. ¶¶ 26, 37. Lilly itself acknowledges in its Zepbound® advertising (in a small print disclaimer buried in a long footnote) that its SURMOUNT-5 study was "less rigorous" and that the findings were "less certain," yet it does nothing to adequately explain why the study was not rigorous and why. Lilly's Mounjaro® advertising is even worse – it does not disclose

27

anywhere that the reported trial was "less rigorous" and its results "less certain."

### 3.    Survey Evidence Confirms That Lilly's Advertising Deceives Consumers

Because Lilly's advertisements are false by necessary implication and also false establishment claims, they are literally false as a matter of law, which entitles Novo Nordisk to relief without any showing of actual consumer confusion. But, Novo Nordisk brings additional evidence to this Court: although not required for this motion, it also commissioned consumer perception surveys to confirm what the face of the advertising already establishes – that consumers who see Lilly's ads are in fact misled into believing that the highest doses of Zepbound® and Mounjaro® were fairly compared to the highest doses of Wegovy® and Ozempic®, and that Lilly's products were shown to be dramatically more effective. The survey also shows that a substantial portion of consumers believe that Wegovy® will only help consumers lose on average 33 pounds, when, in fact, Wegovy® can only help consumers lose an average of 47 pounds. These surveys independently satisfy the Lanham Act's deception element and remove any doubt about the misleading tendency of Lilly's advertising.

Courts regularly find consumer surveys to be persuasive evidence of an advertisement's tendency to mislead and deceive consumers. *E.g.*, *Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 353 (D.N.J. 2020) ("Proof of deception can be, and often is, proven though a properly conducted survey").

28

Although no such proof is required where, as here, the advertising is literally false, the Third Circuit has held that survey evidence showing that 15% or more of respondents are confused or misled is independently sufficient to establish a Lanham Act false advertising claim. *Novartis*, 290 F.3d at 590, 594 ("[W]e believe that survey evidence demonstrating that 15% of the respondents were misled . . . is sufficient to establish the 'actual deception or at least a tendency to deceive a substantial portion of the intended audience' . . . necessary to establish a Lanham Act claim for false or misleading advertising under section 43(a)"). ***Novo Nordisk's surveys far exceed the 15% threshold.***

First, Novo Nordisk commissioned Dr. Bruce Isaacson to survey consumers exposed to Lilly's Zepbound® television commercial. Dr. Isaacson's survey was designed to test whether Lilly's advertising based on SURMOUNT-5 misleads consumers into believing that Zepbound® produces dramatically more weight loss than Wegovy® as those products are currently available on the market. Dr. Isaacson's survey demonstrates that the advertising misleads more than 30% of relevant consumers, who take away the message that Zepbound® is *significantly* more effective. Declaration of Dr. Bruce Isaacson ¶ 4 ("Isaacson Decl."). The survey further demonstrates that more than 16% of respondents took away the message that Wegovy leads to only 33 pounds of weight loss, and that more than 27% of consumers failed to understand that the SURMOUNT-5 trial cited in the ad was not

29

based on the highest dose of Wegovy® currently available. *Id.*

Dr. Isaacson's findings confirm that Lilly's existing disclosures — which mention in small print that Wegovy® 7.2 mg was not evaluated in the study — are substantively inadequate and incomplete to correct the misleading net impression that Zepbound® is dramatically superior to Wegovy® for weight loss. These net measures far exceed the 15% threshold the Third Circuit has held sufficient to establish deception under the Lanham Act. *See Novartis*, 290 F.3d at 590, 594.

Dr. Isaacson's findings extend to Lilly's website and social media advertising, which convey the same misleading core message. Consumers viewing the website, TikTok, and Facebook versions—which present the same or stronger claims—are at least as likely to be misled. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 66–67 (2d Cir. 2016) (survey testing one advertisement was probative of the misleading nature of other advertisements conveying the same message).

Novo Nordisk also submits the consumer perception survey of Hal Poret, who surveyed consumers exposed to Lilly's Mounjaro® television commercial. Mr. Poret's survey was designed to test whether Lilly's disclaimer—that "Ozempic® 2mg [was] not available at the time of study"—caused consumers to understand that the study had not tested the highest and most effective currently approved dose of Ozempic®. Mr. Poret's survey demonstrates that the advertising misleads more than

30% of relevant consumers into believing that the Mounjaro® commercial is comparing Mounjaro® to the highest and most effective dose of Ozempic®, or to Ozempic® generally without limitation. Declaration of Hal Poret ¶ 3.

### B. Lilly's Deceptive Advertising Is Material

Deceptive advertising is material if "it is likely to influence the purchasing decision." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990); *Newborn Bros. Co.*, 481 F. Supp. 3d at 356. Materiality is established when "the false or misleading statement relates to an inherent quality or characteristic of the product" or when "the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's." *Newborn Bros.*, 481 F. Supp. 3d at 356. Both tests are satisfied here.

Lilly's false and misleading claims go directly to the core purpose of these medications. Weight-loss efficacy is "an inherent" quality of a GLP-1 weight-loss medicine; A1c reduction is "an inherent" quality of a GLP-1 diabetes medicine. These are the very reasons consumers take these medicines. Advertising that falsely communicates dramatic superiority on those metrics, and misrepresents the efficacy of the competitor's products, is material as a matter of law. *See IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*, 2009 WL 5205968, at *9 (D.N.J. Dec. 28, 2009) (advertising statements about a product's core performance metric "go so clearly to

31

the purpose of the product" as to be material as a matter of law); *see also Telebrands Corp. v. Ragner Tech. Corp.*, 2019 WL 1468156, at *4 (D.N.J. Apr. 3, 2019).

Materiality is independently confirmed by the direct competitive relationship between the parties: Novo Nordisk and Lilly compete head-to-head for sales of FDA-approved GLP-1 medicines for weight reduction and the treatment of type 2 diabetes, and Lilly's false comparative advertising is designed to steer patients toward Lilly's products. *See CareDx, Inc. v. Natera, Inc.*, 2019 WL 7037799, at *11 (D. Del. Dec. 20, 2019), *report and recommendation adopted*, 2020 WL 401773 (D. Del. Jan. 24, 2020). Given that Novo Nordisk and Lilly sell over 99% of the FDA-approved GLP-1 medicines in the United States (Gastineau Decl. ¶ 24), essentially every sale diverted to Lilly is a sale that Novo Nordisk has lost. *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 260–61 (2d Cir. 2014).

Lilly's advertising will also inevitably influence patients' perceptions of the medicines, leading them to request Lilly's products in discussions with healthcare professionals, which in turn impacts prescriber decisions. *See* Gastineau Decl. ¶ 25; Traina Decl. ¶¶ 39–40; Radin Decl. ¶ 35. Lilly's false superiority message thus operates at multiple levels: it shapes patient demand, the clinical conversation between patient and prescriber, and ultimate prescriber decisions.

**C.    Lilly's Falsely Advertised Goods Travel in Interstate Commerce**

Lilly's falsely advertised Zepbound® and Mounjaro® products are offered

for sale, marketed, and sold nationwide, thereby traveling in interstate commerce. Novo Nordisk therefore establishes this element of its false advertising claims. *See Newborn Bros.*, 481 F. Supp. 3d at 358; *Hayward Indus., Inc. v. Saltwater Pool Supplies*, 2021 WL 1940711, at *10 (D.N.J. May 14, 2021).

**D.    Lilly's Advertising Has Injured and Will Continue to Injure Novo Nordisk**

To establish false advertising under the Lanham Act, a plaintiff must show "economic or reputational injury flowing directly from deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133, 140 (2014); *Newborn Bros. Co.*, 481 F. Supp. 3d at 358. When the parties are each other's principal competitors, and literal falsity and deliberate deception have been established, injury to the plaintiff may be presumed. *Merck Eprova*, 760 F.3d at 260–61, 262 (affirming a presumption of injury where the plaintiff was the defendant's main competitor for the product at issue, such that the defendant's false advertising necessarily harmed the plaintiff).

Novo Nordisk is entitled to a presumption of harm because it competes directly with Lilly for the sales of GLP-1 medicines used for weight reduction and the treatment of type 2 diabetes. Beyond the presumption, Novo Nordisk easily satisfies this element because Lilly's false campaigns target Novo Nordisk's products by name, divert demand from Novo Nordisk's directly competing GLP-1 medicines, and damage the goodwill and reputation of Wegovy® and Ozempic®.

33

Lilly's ads influence consumer preferences at the point when they decide which GLP-1 medicine to pursue or ask their healthcare care provider about. Consumers diverted to Zepbound® by Lilly's false weight loss superiority claim are prescriptions Novo Nordisk otherwise would have competed for; the same is true for consumers diverted to Mounjaro® by Lilly's false A1c superiority claim.

Lilly's advertising also harms Novo Nordisk's reputation and goodwill. *See Novo Nordisk A/S*, 2026 WL 222214, at *6 (finding injury to Novo Nordisk's goodwill and reputation from false advertising about its semaglutide products sufficient to establish the Lanham Act injury element). Lilly's advertising falsely diminishes Novo Nordisk's medicines by portraying them as substantially less effective than Lilly's competing medicines. Once patients absorb the false impression that Novo Nordisk's medicines are significantly inferior, that reputational damage is difficult to reverse even if the advertising is later withdrawn.

## II.     Novo Nordisk Will Suffer Irreparable Harm If the Injunction Is Denied

Novo Nordisk is entitled to a statutory presumption of irreparable harm because it has demonstrated a likelihood of success on the merits. *See* 15 U.S.C. § 1116(a); *MGMT Residential, LLC v. Reeves*, 2023 WL 2471263, at *3 (E.D. Pa. Mar. 10, 2023). Courts in this District have also recognized that false direct comparative advertising gives rise to an independent presumption of irreparable injury, because "a false direct comparison necessarily harms the goodwill of the

34

victimized firm." *Pharmacia Corp.*, 292 F. Supp. at 608 (collecting cases). Lilly's campaigns name Wegovy® and Ozempic® by brand and make false direct comparisons against each — both presumptions apply.

Even without the presumptions, Lilly's advertising is causing lasting damage to the clinical reputations of Novo Nordisk's products. The false message that Wegovy® dramatically underperforms Zepbound® tarnishes Wegovy®. The false message that Ozempic® materially underperforms Mounjaro® similarly damages Novo Nordisk's most important diabetes medicine, Ozempic®. Once those false impressions take hold among patients and prescribers, they are extraordinarily difficult to reverse. *See Groupe SEB USA, Inc.*, 774 F.3d at 204–05.

Lilly has not slowed its campaign; it has accelerated it. Since the revised Zepbound® television commercial began airing, it has received approximately 700 million impressions. Lilly then expanded to sponsored TikTok and Facebook advertisements in June 2026 that characterizes SURMOUNT-5 as a "head-to-head study" and declare that "those are just the facts." Every day these campaigns run, they deepen false impressions and make the harm harder to undo.

Novo Nordisk acted promptly. It sent Lilly a cease-and-desist letter on April 22, 2026, shortly after Wegovy® 7.2 mg was approved. Lilly never responded and instead made only cosmetic revisions. Novo Nordisk then worked diligently to develop the evidentiary record, including designing and executing two separate

35

consumer perception surveys. And while Novo Nordisk was in the process of developing evidence confirming that the ads are misleading, Lilly expanded its campaign to social media which reinforced to Novo Nordisk that it was left with no choice but to seek this injunction.

### III.    The Balance of Equities Tips in Favor of Novo Nordisk

The balance of equities tips sharply in Novo Nordisk's favor. A plaintiff seeking a preliminary injunction must show that the harm it would suffer absent relief outweighs the hardship an injunction would impose on the defendant. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). That standard is easily satisfied here.

Lilly cannot claim hardship from being ordered to stop conduct it knowingly continued after notice. Novo Nordisk's April 2026 cease-and-desist letter put Lilly on clear notice, and Lilly's counsel subsequently confirmed in writing that Lilly "rejects Novo's flawed demand" and considers its advertising "truthful." Bernstein Decl. Ex. 2. The Third Circuit has held that defendants in Lilly's position "can hardly claim to be harmed, since [they] brought any and all difficulties occasioned by the issuance of an injunction upon [themselves]." *Opticians Ass'n*, 920 F.2d at 197; *see also Novartis*, 290 F.3d at 596; *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004).

By contrast, Novo Nordisk faces ongoing, compounding harm with each day

36

Lilly's campaigns continue. Lilly's false superiority messages reach new patients, divert prescriptions from Wegovy® and Ozempic®, and deepen reputational harm that no damages award can fully repair. That is precisely the type of injury equitable relief is designed to prevent.

The injunction Novo Nordisk seeks is narrow. It would not stop Lilly from selling Zepbound® or Mounjaro®, from advertising either product's attributes or clinical results, or from making any truthful claim about either medicine's efficacy. Lilly already runs numerous television commercials for both products that make no comparative claims against Novo Nordisk, and those commercials would be unaffected. Gastineau Decl. ¶¶ 16, 18, Exs. 1–10. For Zepbound® specifically, Lilly already airs a shorter version of the challenged commercial that is virtually identical except that the misleading SURMOUNT-5 comparison is removed; it advertises the SURMOUNT-1 data showing 48 pounds of average weight loss. Gastineau Decl. ¶ 16, Exs. 1–4. This demonstrates that Lilly can and does advertise Zepbound® effectively without the false comparative claims. The only thing Lilly would be required to stop doing is disseminating the version containing the misleading comparative superiority claims based on outdated trials. Lilly would not have to alter any of the other commercials it currently runs. And, regardless, compliance with the law is no hardship. *See Smart Vent, Inc. v. Crawl Space Door Sys. Inc.*, 2017 WL 4948063, at *7 (D.N.J. Nov. 1, 2017); *Coach, Inc. v. Fashion Paradise, LLC*, 2012

37

WL 194092, at *9 (D.N.J. Jan. 20, 2012); *MGMT Residential*, 2023 WL 2471263, at *4; *see also GlaxoSmithKline LLC v. Boehringer Ingelheim Pharms., Inc.*, 484 F. Supp. 3d 207, 228 (E.D. Pa. 2020) (equities favored injunction where defendant would only be enjoined from making false statements not supported by scientific studies but remained free to advertise its product).

## IV.    Injunctive Relief Is in the Public Interest

Courts consistently recognize a strong public interest in preventing false and misleading advertising, *Novartis*, 290 F.3d at 597, and in ensuring that consumers receive information that allows them to assess product quality, *Newborn Bros. Co.*, 481 F. Supp. 3d at 359. That interest is at its strongest here, where the challenged advertisements concern prescription medications used by patients making consequential health decisions. *See Am. Home Prods. Corp. v. Chelsea Lab'ys, Inc.*, 572 F. Supp. 278, 281 (D.N.J. 1982), *aff'd*, 722 F.2d 730 (3d Cir. 1983) (stating in the context of prescription medications, patient health and safety "stands highest on the scale" of public interest).

Patients and healthcare professionals evaluating GLP-1 treatments are entitled to accurate comparative information grounded in current and methodologically sound evidence. Lilly's campaigns deny them that information by falsely presenting SURMOUNT-5 and SURPASS-2 as proof of dramatic superiority without disclosing that neither clinical trial tested the highest and most effective approved

dose of the competing product. Because Novo Nordisk has shown a likelihood of success on the merits, the public interest favors an injunction. *Novartis*, 290 F.3d at 597; *GlaxoSmithKline LLC*, 484 F. Supp. 3d at 228.

## V.    The Court Should Require Corrective Advertising

Enjoining continued dissemination of Lilly's false advertising is necessary but not sufficient. The Zepbound® commercial alone has received approximately 700 million impressions; the Mounjaro® campaign has run nationally on television and the web; and Lilly has recently doubled down through sponsored social media. Those false impressions will not evaporate when the ads stop running. The only way to restore the *status quo ex ante* is for Lilly to be ordered to issue corrective advertising to clean up the marketplace and correct consumers' understanding. *See, e.g.*, *Kalmbach Feeds, Inc. v. Purina Animal Nutrition, LLC*, 2025 WL 3153412, at *14 (S.D. Ohio Nov. 12, 2025) ("just because [a defendant] has addressed some forms of its prior advertisements does not mean that all confusion will have dissipated").

Courts have authority to order corrective advertising at the preliminary injunction stage. *Id*. at *13–16. That is especially appropriate where cessation of the challenged conduct will not undo false impressions already embedded in the marketplace. *See, e.g.*, *Ames Publ'g Co. v. Walker-Davis Publ'ns*, Inc., 372 F. Supp. 1, 15–16 (E.D. Pa. 1974); *Energy Four, Inc. v. Dornier Med. Sys., Inc.*, 765 F. Supp.

39

724, 735–37 (N.D. Ga. 1991); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263–65 (4th Cir. 2017).

Novo Nordisk's consumer surveys confirm that Lilly's campaigns have planted false beliefs in consumers' minds that will persist long after the ads stop running. GLP-1 prescribing is impacted in significant part by patient-initiated conversations with physicians shaped by consumer advertising, and false impressions from Lilly's television, website, and social media campaigns will be carried into those clinical interactions long after the ads stop running.

Novo Nordisk accordingly requests that the Court require Lilly to issue corrective advertising through multiple appropriate channels. *See e.g., Kalmbach Feeds*, 2025 WL 3153412, at *14–16 (ordering corrective retraction posted on defendant's website and issued to prior recipients); *Handsome Brook Farm*, 700 F. App'x at 263–65 (affirming requirement that defendant reach original recipients of false communication with corrective retraction).

## CONCLUSION

For the foregoing reasons, Novo Nordisk respectfully requests that the Court (1) preliminarily enjoin Lilly from disseminating the challenged comparative advertising, or materially similar advertising, in any medium; and (2) require Lilly to disseminate corrective advertising.

Respectfully submitted,

Dated:  July 24, 2026    DEBEVOISE & PLIMPTON LLP
        New York, NY

By: */s/ Megan K. Bannigan*

David H. Bernstein
(dhbernstein@debevoise.com)*
Megan K. Bannigan
(mkbannigan@debevoise.com)
Jared I. Kagan (jikagan@debevoise.com)*
Marissa Baron (mbaron@debevoise.com)*
Rachel Burns (rmburns@debevoise.com)*

66 Hudson Boulevard
New York, New York 10001
Telephone: 212-909-6000
*Pro Hac Vice* forthcoming

Vikas Khanna (vkhanna@sillscummis.com)
SILLS CUMMIS & GROSS P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-6993

*Attorneys for Plaintiff Novo Nordisk Inc.*

41